IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| CASSAUNDRA L. BRYSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:16-cv-00233 |
| | ) | |
| DLP TWIN COUNTY REGIONAL HEALTHCARE, LLC, | ) ) | By: Elizabeth K. Dillon United States District Judge |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff Cassaundra L. Bryson filed this action asserting claims against her former employer, DLP Twin County Regional Healthcare, LLC (the Hospital) under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.* Bryson, who is Caucasian, alleges that she was subjected to a racially hostile work environment and terminated because she is married to an African American man and because her children are biracial.[1]

Pending before the court is the Hospital's motion for summary judgment, seeking judgment as a matter of law on both claims. (Dkt. No. 27.) Specifically, the Hospital contends it is entitled to summary judgment on the hostile work environment claim because Bryson cannot show any comments were made because of her or her family's race and because the comments were not sufficiently pervasive or severe—either subjectively or objectively— to create a hostile work environment. As to the discrimination claim based on her termination, the Hospital argues that the undisputed facts show it had a legitimate, non-discriminatory reason for her termination and that there is no evidence of pretext.

---

[1] Her complaint also contains a retaliation claim, but that claim has been dismissed. (Mem. Op. & Order, Dkt. Nos. 20, 21.)

The motion has been fully briefed, neither party has requested a hearing, and the court concludes that no hearing is required. For the reasons set forth herein, the motion for summary judgment will be granted in part and denied in part.

I. BACKGROUND

The court construes the evidence, and reasonable inferences therefrom, in the light most favorable to Bryson, the non-moving party. *Laing v. Fed. Express Corp.*, 703 F.3d 713, 714 (4th Cir. 2013).

**A. Bryson's Employment & Disciplinary History**

The Hospital hired Bryson as a social worker assistant in August 2011. Throughout her employment, Bryson's direct supervisor was Kippy Anderson, whose title was Director of Home Health. (Bryson Dep. 95, Dkt. No. 27-1.) Bryson was also supervised by Larissa Baker, Director of Hospice. (*Id.* at 95, 96.) Baker and Anderson, who jointly made the decision to terminate Bryson, are both Caucasian.

Bryson's primary duties were to contact and visit patients referred to her. She provided services to meet patients' social and emotional needs, such as helping to complete Medicaid applications, delivering food, and coordinating services with other local agencies. She received patient referrals from nurses and was required to make a home visit and initial assessment within 48 hours of receiving a referral. Any exceptions to this requirement had to be documented with a phone call to the client and a chart note, both within 48 hours of the referral. Bryson testified that she understood it was her responsibility "to complete documentation accurately, timely, and according to agency policy" and that the hospital billed according to her documentation. (Bryson Dep. 227–33, 245–46; Bryson Dep. Exs. 21 & 22, Dkt. No. 27-1.) She also understood that inaccurate time entries could lead to the patients, their insurance companies, and Medicaid

2

being billed incorrectly, which would be "fraudulent" and "a major issue" for the Hospital. (*Id.* at 232–33.)

Bryson's job also required that she write down the specific times that she performed tasks and home visits throughout the day in what was called a daily visit record (DVR). As Bryson affirmed in her deposition, accurate DVRs were critical both for payroll purposes and because the Hospital billed patients based on the exact length of time she performed services on their behalf. Although Bryson was required to turn her DVRs in to the Hospital the following day, she admitted she sometimes submitted them late. (*Id.* at 260–63.)

According to the Hospital, Bryson was disciplined twice and subsequently terminated because she failed to submit timely and accurate documentation about her patient visits and office hours. The first time she was disciplined for inaccurate documentation was June 2013. At that time, Anderson reviewed gas card receipts from employees who were authorized to purchase gas using the Hospital's gas card. The time-stamps on the receipts led Anderson to believe Bryson and two other employees were actually pumping gas at times that they documented in their DVRs that they were performing other tasks or visiting a patient's home. When Bryson met with Anderson, Baker, and a senior director of human resources to discuss this issue, she admitted that her DVR logs were sometimes inaccurate and that she sometimes failed to turn her DVRs in on time. (*Id.* at 273–77; Bryson Dep. Ex. 30; Anderson Dep. 31–32, Dkt. No. 27-2). The other two employees denied making inaccurate entries. Anderson visited or called the gas stations to verify the gas pump records and determined that some of the pumps did not record the correct time; thus, she was unable to confirm conclusively that the other two employees' DVR records were inaccurate based solely on the gas receipts. Because Bryson had admitted that her time entries were "guesses" and admitted being late in turning in her DVRs, Bryson received a

3

written warning. (Bryson Dep. 278–80, Ex. 30.) On the form itself, Bryson signed and included the handwritten statement that her signature was "not an admission of purposely falsely documenting on DVR's [sic] but an admission of carelessness." (Bryson Dep. Ex. 30.) The form also warned her that "another occurrence not necessarily of the same type may result in termination." (*Id.*)

The second discipline was imposed in September 2013.[2] At that time, Bryson was issued a "Final Written Counseling" because Baker and Anderson believed that she had again falsified her time and turned in her DVRs late. In her deposition, Bryson acknowledged that she had submitted an inaccurate DVR, and she also admitted to not turning in her DVRs the following day as required. (Bryson Dep. 286–87.) That written warning informed Bryson that any further violation "will result in termination." (Bryson Dep. Ex. 31.)

Then, in March 2014, Anderson conducted a review of department records in preparation for a national accreditation survey. (Anderson Dep. 41.) She discovered missing documentation, including missing proof that Bryson had actually contacted or visited some of her assigned patients. Around the same time, Baker twice observed Bryson entering the office in the middle of a block of time that she had marked as "office time" on her DVR. (Baker Dep. 24–25, 31, Dkt. No. 27-3; Bryson Dep. Ex. 32.) In her deposition, Bryson contended that she was "working in her car" in the office parking lot on those occasions and further asserted that her supervisors should have searched the parking lot for her if they could not find her in the office. (Bryson Dep. 297–301.) Baker and Anderson did not find her explanations credible, though, and, especially in light of her prior disciplinary history, believed she had failed to complete patient visits and failed to submit accurate and timely paperwork. They thus decided to

---

[2] This was after Bryson's second (and last) performance evaluation.

4

terminate her. (Baker Dep. 27; Anderson Dep. 51; Bryson Dep. 290 & Ex. 32.) The termination was effective April 29, 2014. (Bryson Dep. Ex. 32.)

In her memorandum in opposition to the summary judgment motion, Bryson disputes a few of the facts set forth by defendant. But with regard to most of the facts related to her discipline and termination, she does not point to any contrary evidence in the record. Moreover, she admitted in her deposition that she engaged in most of the conduct for which she was disciplined.[3]

Bryson refers the court to two types of record evidence to oppose the summary judgment motion. First, she notes that her two performance evaluations were good and so the Hospital was "satisfied with Bryson's work product—until Anderson's daughter began dating a black man." (Pl.'s Mem. Opp'n Mot. for Summ. J. 1, 2, Dkt. No. 29.) The two formal performance appraisals she received were in August 2012 and August 2013. In those appraisals, Anderson ranked Bryson as meeting or exceeding standards in every category, with only one exception. Specifically, on the August 2013 evaluation, Bryson was ranked as not meeting expectations in the category of "provides/coordinates care in a manner to ensure that patient needs are being met in an efficient and cost effective manner. Documentation is reflective of care provided to ensure accurate charges." (Pl.'s Mem. Opp'n Mot. Summ. J., Ex. 2, at 2, Dkt. No. 29-2.) On that category, there was also a note that said, "Received administrative leave in June related to documentation deficits. Inaccurate times/dates on DVRs/notes." (*Id.*) So, the second evaluation noted the June 2013 discipline and both evaluations were given before the September 2013 discipline.

---

[3] Although she does not highlight it in her opposition brief, Bryson testified at her deposition that "everybody" engaged in similar conduct and that others were "fussed at" but not written up for it. (Bryson Dep. 262–63.) She did not identify any particular person, however, who engaged in such conduct and was not disciplined.

5

The other record evidence Bryson counters with is her own testimony that the missing timesheets referenced in her termination paperwork were probably on her desk. She faults Baker for failing to go look at her desk to determine if the timesheets were there. (Opp'n at 2, 3.)

**B. Alleged Incidents of Harassment**

To support her hostile work environment claim, Bryson relies mainly on a series of conversations between her and Anderson and also on two separate incidents involving other employees.[4] The first of those two incidents occurred in December 2013, when she overheard a conversation between a co-worker and one of Bryson's supervisors, Baker. The two women were discussing that the hospital chaplain's white daughter was dating a "black boy." As part of the conversation, the co-worker said, "I can't believe [the chaplain] is letting [his daughter] date a black kid." Baker then questioned what the chaplain's wife was saying, and the co-worker questioned what his congregation at church might be saying. The co-worker further commented that her own "kids aren't allowed to date blacks" and that her husband "would kill them. We just don't believe that is right. The Bible says it's wrong." Baker responded, "I know. [My husband] would too." According to Bryson, she told them that they were "ridiculous" and later complained to a co-worker about the conversation. (Bryson Dep. at 104–08.)

The second incident occurred during a large group meeting with dozens of employees present. Another co-worker commented in the meeting about a non-compliant patient, stating that she would like to "smack her black ass." Bryson testified that, although the comment was not directed toward her, "a lot of people turned around and looked at" Bryson after it was made. She testified that she was embarrassed because she was the "only white person in there with a

---

[4] In its motion, the Hospital asserts that Bryson "does not claim that she heard or was subjected to any racially insensitive or offensive comments during the first two years of her employment." (Def.'s Mem. Supp. Mot. Summ. J. 5, Dkt. No. 28.) Bryson disputes this and cites to a number of incidents discussed in her deposition. She does not specifically allege that any of those occurred in the first two years of her employment, though.

black husband and five black kids" and there were "no black people in there." (Bryson Dep. 122–23, 126–28.)

Aside from these two incidents, the remainder of the alleged harassment stems from a number of comments and conversations Bryson had with Anderson, her immediate supervisor.[5] Specifically, Bryson testified that Anderson came to Bryson's cubicle approximately 6 or 7 times between September 2013 and March 2014 in order to have conversations with Bryson about Anderson's daughter, who was in college at Wake Forest, dating an African-American student. Bryson interpreted Anderson's conversations as "complaining" about her daughter dating that student. They included one conversation in which Anderson asked if Bryson's kids were "having problems" fitting in and in which Anderson stated that she knew a lot of biracial kids that were not accepted by blacks or whites and that a lot of people did not accept them. Bryson replied that her kids did not have problems, that they were very successful, and she did not have those issues. (Bryson Dep. at 146–47, 149–50.)

In another conversation, Anderson expressed that Anderson's husband and her mother would never approve of her daughter's relationship and that her mother would cut Anderson's daughter out of the will. (*Id.* at 157–59.) In a conversation before Christmas, Anderson also commented that she hoped her daughter did not take her boyfriend to her work Christmas party at Wake Forest because that could be detrimental to her career. (*Id.* at 159.) In another conversation, Anderson said it would be "an interesting Christmas" if her daughter brought him home and that the daughter's relationship was causing Anderson's husband "to suffer adverse health issues," to drink, and to fight with Anderson. (*Id.* at 160.) Anderson also worried about her daughter going to Florida "to the ghetto" where the boyfriend's mother lived. (*Id.* at 172.)

---

[5] Anderson denies making some of the statements and testified that there were not as many conversations as Bryson alleges. For purposes of summary judgment, though, the court construes the evidence in the light most favorable to Bryson and therefore credits her testimony about the discussions with Anderson.

7

According to Bryson, she told Anderson that these conversations bothered her. But Anderson "continued to come in there, not once, not twice, but five or six times and continued to tell me about it until I actually was ugly to her about the entire thing. I just had to ask her point blank, please, I have no interest in this conversation. Just don't talk to me about it no more, please." (*Id.* at 156.) At that point, Anderson stopped having the conversations with her. Bryson was not clear when the conversations stopped, but believes it was shortly before her termination.

In addition to the conversations about Anderson's daughter, Anderson also commented, on two separate occasions, about the color of Bryson's husband's skin. Specifically, after seeing Bryson and her husband at the grocery store, Anderson made a comment to Bryson about how her husband was "black, really dark." (*Id.* at 178.) On another occasion, she commented that Bryson's husband was "dark." (*Id.* at 179.)

As noted above, Anderson and Baker terminated Bryson effective April 2014.

## II. DISCUSSION

### A. Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003)).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Id.* at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50). "While courts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958–59 (4th Cir. 1996).

**B. Hostile Work Environment Claim**

Title VII of the Civil Rights Act of 1964 prohibits practices that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Title VII prohibits discrimination with respect to employment decisions having a direct economic impact, like terminations or demotions, as well as actions that create or perpetuate a discriminatory or abusive working environment. *See Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2440 (2013).

Bryson claims that the harassment she experienced created a hostile work environment. To recover on her claim, Bryson must prove that the conduct was: (1) unwelcome; (2) based on her race; (3) "sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive work environment"; and (4) that there is some basis for imputing liability to the Hospital. *See Boyer-Liberto v. Fountainbleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en

9

banc). The Hospital acknowledges that "Title VII's protections extend to third parties such as Ms. Bryson[,] who is white but has a black husband and biracial children." (Def.'s Mem. 4 (citing *Thompson v. N. Am. Stainless, LP.*, 131 S. Ct. 863 (2011)).

The Hospital does not challenge, for purposes of summary judgment, that Bryson can establish the first and fourth elements of her claim. But it argues that Bryson's claim fails because there is insufficient evidence from which she could establish the second and third elements. As to the second, the Hospital argues that neither the comments she overheard—which it contends cannot support her claim in any event—nor those that were directed toward her was based on her race or the races of her husband and children.

As to the third, it contends that the conduct alleged by plaintiff was not sufficiently "severe and pervasive" to support a hostile work environment claim. Thus, it argues that the work environment was neither subjectively nor objectively hostile. The Hospital points to Bryson's own testimony that the comments made her "uncomfortable" and were "annoying," but emphasizes that she never testified the comments felt hostile or abusive. It also argues that the work environment was not objectively hostile.

As it must when evaluating a motion for summary judgment, the court must draw all reasonable inferences in the plaintiff's favor. Here, Bryson's own testimony is sufficient to allow her hostile work environment claim to go to a jury. As to whether or not the comments were based on her race or the races of her husband and family, Bryson's testimony was that her co-workers and supervisors making the comments knew that her husband was black and that her children were biracial. (Bryson Dep. 106–07). Furthermore, it appears that the bulk of Anderson's comments were directed toward Bryson specifically because she had biracial children. That is, Anderson was asking questions about Bryson's children "fitting in" and

10

speaking to her about the topic of Anderson's daughter dating an African American precisely because Anderson was married to an African American and had biracial children. So, the court concludes that Bryson has put forth sufficient evidence as to the second element.

As to whether the comments were sufficiently severe or pervasive, this third element "requires a showing that 'the environment would reasonably be perceived, and is perceived, as hostile or abusive." *Boyer-Liberto v. Fountainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)). Thus, it has both a subjective and an objective component.

As to the subjective component, "the plaintiff may, but is not required to, establish that the environment is 'psychologically injurious.'" *Id.* (quoting *Harris*, 510 U.S. at 22.) The court concludes that Bryson has put forth sufficient evidence from which a jury could find she satisfied both the subjective and objective components of this third element. Bryson's deposition testimony makes clear that she found the comments she overheard and conversations with Anderson to be harassing to an extent they affected her ability to work. (Bryson Dep. 310 ("I feel like I was harassed while I worked there. I was put in an uncomfortable almost impossible working environment and expected to succeed, and I could not."); *see also id.* at 126–27, 151–52 (describing that the comments "embarrassed" her, "made [her] feel uncomfortable," and were "annoying").) She may not have used the words "abusive" or "hostile," but her deposition testimony clearly supports such an interpretation, and the court concludes that a jury could so find.

As to the objective component, the court has carefully considered the issue and concludes that a reasonable jury could find the conduct here sufficiently severe and pervasive to support her claim. Title VII is not a "general civility code" because if that were the case "we would be

11

litigating past sundown in ever so many circumstances." *Ziskie v. Mineta*, 547 F.3d 220, 228 (4th Cir. 2008). Thus, not every workplace aggravation gives rise to an actionable legal claim. *See E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 1008) ("Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life."). Instead, with regard to the objective component, the court must determine whether "a reasonable person in the plaintiff's position" would find a work environment hostile by looking "at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto*, 786 F.3d at 277 (internal quotation marks and citations omitted). Where a supervisor is doing the harassing, moreover, that can increase the severity. *Id.* at 278 ("Simply put, 'a supervisor's power and authority invests his or her harassing conduct with a particular threatening character.'") (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998)).

In *Boyer-Liberto*, for example, the en banc court held that a reasonable jury could find that a supervisor's "two uses of the 'porch monkey' epithet . . . were severe enough to engender a hostile work environment." *Id.* at 280. Here, the language used was not as severe as the language in *Boyer-Liberto*. But the conversations about interracial dating and Anderson's repeated questioning of Bryson about her biracial children, and the conversations about how Anderson's daughter engaging in an interracial relationship were causing problems in Anderson's family, occurred with more frequency than the two comments in *Boyer-Liberto*. And while they were not physically threatening, the court believes a reasonable person in

12

Bryson's position could find them humiliating.  Indeed, a jury could find that repeated inquiries or comments from your supervisor about the color of your husband's skin or whether your biracial children "fit in" could be harassing.

Defendant posits that Anderson's comments as to Bryson's husband's skin color may have been "spoken out of insensitivity or ignorance," but were not intended to be harassing. (Def.'s Mem. Supp. Mot. Summ. J. 13.)  That may be true, and a reasonable jury might well conclude that there was no harassment here.  But the court believes that a reasonable jury also could find that all of the comments and conversations, considered together and in context, were sufficiently severe and pervasive to create a hostile work environment.  As Bryson explained in her deposition, the mere references to race or the general topic of Anderson's daughter's dating life might not have been offensive if they stood alone, but the overall tone of them was that the interracial nature of the relationship was causing all sorts of strife for Anderson's family. (Bryson Dep. 156.)  That, and the fact that the conversations were paired with questions about Bryson's experiences raising biracial kids and occurred around the same time as Anderson's comments about the skin color of Bryson's husband, could lead a reasonable jury to conclude they were harassing enough to interfere with Bryson's work performance.  (*See* Bryson Dep. 310).  In short, while the court believes this issue is a close call, it concludes that there is sufficient evidence to allow a reasonable jury to find in Bryson's favor.  Thus, whether or not the alleged harassment was sufficiently severe and pervasive is a decision for the jury, not one for this court to make on summary judgment. *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 208 (4th Cir. 2014) (reversing district court's grant of summary judgment where "[t]he totality of

the record . . . creates too close a question as to whether [the alleged] behavior created an objectively hostile or abusive work environment").[6]

For these reasons, the Hospital's motion for summary judgment as to Bryson's hostile work environment claim will be denied.

## C. Discrimination in Termination Claim

Turning to Bryson's discrimination claim, the parties appear to agree that the claim should be analyzed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under this framework, a plaintiff first must set forth a prima facie case by establishing: "(1) that she is a member of a protected class; (2) that she suffered from an adverse employment action; (3) that she was performing at a level that met her employer's legitimate expectations; and (4) that the position was filled by a similarly qualified applicant outside the protected class." *Guessous v. Fairview Prop, Invs., LLC*, 828 F.3d 208, 219 (4th Cir. 2016) (quoting *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003)) (alterations omitted).

Once an employee establishes a prima facie case, then "the burden of production . . . shifts to the employer to articulate a non-discriminatory . . . reason for the adverse action; [and then] the burden . . . shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory . . . ." *Id.* at 216 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–56 (1981)). "At this last step, the burden to demonstrate pretext merges with the ultimate

---

[6] Defendant asserts—both in its motion and its reply—that Bryson's claims cannot be based on comments that she overheard because they were not directed toward her. This argument has been rejected by the Fourth Circuit. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 333 (4th Cir. 2011) ("[T]he totality of the circumstances includes conduct directed not at the plaintiff."); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001) (holding that evidence of comments directed at persons other than the plaintiff, but in the plaintiff's presence, are evidence of a general work atmosphere that are relevant to the inquiry of whether conduct was severe and pervasive and describing defendant's contention to the contrary as "find[ing] no support in the law").

14

burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Lettieri v. Equant Inc.*, 478 F.3d 640, 646–47 (4th Cir. 2007) (citations and internal quotation marks omitted).

Applying these principles here, the court will assume *arguendo* that Bryson can establish a prima facie case. The court also concludes that the Hospital has met its burden of production by providing a non-discriminatory reason for Bryson's termination. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) ("This burden is one of production, not persuasion; it 'can involve no credibility assessment.'") (citation omitted). Specifically, the Hospital has explained that it engaged in progressive discipline of Bryson, including two warnings prior to termination, for failing to submit accurate and timely documentation. Thus, it contends, the last instance of misconduct—also involving missing paperwork and inaccurate time entries—warranted termination.

Having found that the Hospital has met its burden of production and articulated a legitimate nondiscriminatory reason for an adverse employment action, "the McDonnell Douglas frame-work—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination vel non." *Reeves*, 530 U.S. at 142 (internal quotation marks and citations omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253. In order to show pretext, Bryson must prove that the explanation given for her termination "is unworthy of credence," which requires more than a mere showing that the "proffered reason is unpersuasive, or even obviously contrived." *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 256). "The ultimate question is whether the employer intentionally discriminated . . . ." *Reeves*, 530 U.S. at 146–47 (quotation omitted).

15

Applying those principles here, the court concludes that no reasonable jury could find for Bryson on her discrimination in termination claim. First of all, Bryson does not really contest the Hospital's proffered reason; she admits most of the conduct for which she was disciplined and points to no evidence that she in fact complied with her employer's requirements. Instead, she makes the blanket—and conclusory—assertion that "everyone else" engaged in the same conduct, and she faults her supervisors for not going to look through her desk for any missing documentation.

Neither of these arguments can stave off summary judgment in the Hospital's favor as to this claim. As to the first, it is a conclusory statement, and she has provided no specific evidence that it is true, nor identified anyone with the same disciplinary history as her that was not terminated.

As to the second, Title VII does not require that an employer engage in an exhaustively thorough investigation and scour its premises to see if there is any evidence that contradicts its perception that an employee has not performed her job appropriately. Indeed, it is not for the court (or the jury) to "decide whether the reason [for the termination] was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (internal citation and quotation marks omitted); *see Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005) (reasoning that the court does not "sit as a 'super-personnel department weighing the prudence of employment decisions' made by the defendant[]") (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). The defendant has offered a reason for Bryson's termination, and she does not contest that she engaged in the conduct for which she was terminated. She also points to nothing else that a jury could reasonably rely on to determine that the real reason for

16

her termination was discrimination. Quite simply, there is insufficient evidence from which a jury could find the real reason for Bryson's termination was racial discrimination.

Additionally, Bryson's argument that her *prior performance* evaluations somehow show pretext does not make sense. Her second evaluation referenced her first discipline and noted documentation as an area where she was not adequately performing. The fact that, on two occasions *after* the overall positive evaluations, there were additional failures by Bryson to perform her job adequately, which resulted in further discipline and eventual termination, does not establish pretext. *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 474 (3d Cir. 2005) ("The attempt to use past positive performance reviews to show that more recent criticism was pretextual fails as a matter of law.")

Accordingly, the court will grant summary judgment in the Hospital's favor as to Bryson's Title VII claim of discrimination based on her termination.

III.  CONCLUSION

For the foregoing reasons, the court will grant in part and deny in part defendant's motion for summary judgment. A separate order will be entered.

Entered: August 14, 2017.

/s/ *Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge